NEWTON vs. COMMONWEALTH EMPLOYMENT RELATIONS BOARD, 100 Mass. App. Ct. 574

 
 CITY OF NEWTON vs. COMMONWEALTH EMPLOYMENT RELATIONS BOARD & another. [Note 1]

100 Mass. App. Ct. 574
 September 1, 2021 - December 30, 2021

Court Below: Commonwealth Employment Relations Board
Present: Green, C.J., Singh, & Hand, JJ.

 

Police, Collective bargaining. Public Employment, Police, Collective bargaining, Psychiatric examination. Labor, Public employment, Collective bargaining, Duty to bargain, Police. Municipal Corporations, Police, Collective bargaining. Waiver. Commonwealth Employment Relations Board.

The Commonwealth Employment Relations Board (board) did not err in concluding that a city was required to engage in impact bargaining upon demand over the criteria and procedures for fitness for duty examinations of a police officer and violated G. L. c. 150E, § 10 (a) (5), and, derivatively, § 10 (a) (1), in failing to do so, where, given that the examination results had a direct impact on job security and the city's managerial decisions with respect to employment, the methods and means by which the examinations were conducted were mandatory subjects of bargaining; where the criteria the union sought to bargain (i.e., the process of requesting the examinations, the procedures for administering them, and the subsequent use of information obtained in the course of them) were distinct from the city's order for the examinations themselves; where the city's interest in public safety was not undercut by the requirement that it engage in impact bargaining with the union over the procedures and criteria for the fitness for duty examinations; and where the interplay between the provisions of G. L. c. 150E and the civil service law, G. L. c. 31, § 61A, did not relieve the city of its duty to bargain the terms and impact of the fitness for duty examinations [578-584]; further, the board correctly concluded that the union did not waive its right to negotiate the means and impact of the fitness for duty examination requirement, where neither an article of the collective bargaining agreement (agreement) pertaining to an annual physical examination by a specified examiner nor an article of the agreement containing a broadly framed management rights clause provided a basis for inferring a clear and unmistakable waiver by the union of mandatory bargaining over the manner and means of fitness for duty examinations [584-585], and where the union did not waive by inaction its right to negotiate the means and impact of the fitness for duty examination requirement, given that the union did not have actual knowledge of the city's actions in the absence of any mutually known and agreed-upon past practice of sending officers for examination or for unilaterally imposing 

 Page 575 

the procedure related to the examinations, and given that the union had no actual notice that the examinations were being performed in reliance on the police department's code of conduct or a city ordinance that empowered the city to order fitness for duty examinations [585-587].

APPEAL from a decision of the Commonwealth Employment Relations Board.

 Jeffrey A. Honig, Deputy City Solicitor, for city of Newton.

 Jillian M. Bertrand for Commonwealth Employment Relations Board.

 Alan H. Shapiro (John M. Becker also present) for Newton Police Superior Officers Association, MassCOP Local 401.

 HAND, J. In 2016, the chief of police (chief) of the city of Newton (city), in consultation with the city's employment manager, ordered Captain Doe [Note 2] to undergo physical and psychological "fitness for duty" examinations, and placed him on paid administrative leave pending the results of those examinations. The Newton Police Superior Officers Association, MassCOP Local 401 (union) -- of which Doe was a bargaining unit member and which had a collective bargaining agreement with the city (CBA) -- requested bargaining over certain aspects of the examinations. The city did not bargain as requested by the union. After undergoing both examinations, Doe was cleared to return to work. The union filed a charge of prohibited practice with the Department of Labor Relations (DLR) alleging, inter alia, that the city had engaged in practices in violation of G. L. c. 150E, § 10 (a) (5), and derivatively, § 10 (a) (1), [Note 3] when it (1) failed to bargain over the procedure for fitness for duty examinations and (2) imposed a fitness for duty policy as a condition of employment without first giving the union notice and an opportunity to bargain to resolution or impasse about the decision and its impact on employees' terms and conditions of employment. [Note 4]

 A hearing officer of the DLR, and on the city's appeal from the DLR decision, the Commonwealth Employment Relations Board

 Page 576 

 (board), concluded that the city failed to meet its obligation to engage in impact bargaining over the criteria and procedure for the fitness for duty examinations to which Doe was required to submit as a condition of his continued employment -- including, specifically, the selection of the examiner, the information to be transmitted to the examiner, the testing protocol to be used by the examiner, the results to be generated by the examiner, and to whom the results of the examinations were to be communicated -- and "when it imposed the fitness for duty policy as a condition of [Doe's] continued employment without providing notice and an opportunity to bargain to resolution or impasse about the decision and [its] impacts . . . on employees' terms and conditions of employment." [Note 5] The board also rejected the city's argument that the union had waived its right to bargain over these issues. We affirm.

 Background. We summarize the undisputed facts as found by the board, supplementing with additional undisputed facts in the record as needed. In 2016, the chief noted that Doe had recently taken an unusually high number of personal days following recent deaths in his family and a personal injury not related to his work, and the chief believed that Doe "seemed to be a different person than he had been." [Note 6] Citing these reasons, on September 27, 2016, the chief presented Doe with a letter that placed him on paid administrative leave pending the results of physical and psychological fitness for duty examinations. The physical examination was to take place that day, and the letter informed Doe that the city's human resources department would shortly advise him of the date of the appointment for the psychological examination. Following receipt of the letter, Doe requested union representation.

 During a meeting at which the chief, Doe, and Doe's union

 Page 577 

 representative were present, the chief stated that he had "just cause" under the city police department's "Code of Conduct [and] Appearance" (code of conduct) to order Doe to undergo the examinations, citing, in addition, his authority to order the examinations under city ordinance § 2-46(c). [Note 7], [Note 8] The result of the meeting was an agreement that Doe would comply with the order. Doe attended the physical examination, provided samples for drug testing, and submitted to a breathalyzer test. Later that day, Doe was cleared by the first examiner to return to work pending the results of the drug test. Doe ultimately passed all drug and alcohol tests.

 The following day, September 28, 2016, the union sent a letter to the chief seeking certain information regarding the completed physical and impending psychological examinations, [Note 9] and relying on DLR case law, demanded that the city bargain over "(1) [t]he selection of the [examiner]; (2) [t]he information [to be] transmitted to the [examiner]; (3) [t]he testing protocol to be used by the [examiner]; (4) [w]hat results are to be generated by the [examiner] and to whom [the results] are to be communicated." The city did not bargain with the union as requested. Doe attended the appointment for the psychological examination, was cleared for duty, and was ordered back to work on October 7, 2016. The union then filed a charge of prohibited practice with the DLR.

 Page 578 

 Following a hearing, the DLR hearing officer determined that the city had violated G. L. c. 150E, § 10 (a) (5), and, derivatively, § 10 (a) (1), when it failed to bargain upon demand about the criteria and procedure for fitness for duty examinations (count III), and "when it imposed a fitness for duty policy as a condition of continued employment without providing notice and an opportunity to bargain to resolution or impasse about the decision and the impacts of the decision on employees' terms and conditions of employment" (count IV). [Note 10] On appeal from the hearing officer's decision, the board affirmed and declined to find that the union had waived the right to demand to bargain with the city. [Note 11]

 Discussion. We begin by clarifying the scope of this appeal. The only issues as to which the union demanded bargaining were the criteria and procedures for fitness for duty examinations. Accordingly, we need not and do not decide whether the decision to impose fitness for duty examinations, or to place Doe on administrative leave pending the completion of a fitness for duty examination, or to order him to undergo such an examination, was subject to bargaining. The board concluded, based on what it treated as "well-established precedent," that those actions were part of the city's nonbargainable prerogative, and at oral argument before this court, the union agreed that those issues were not before us. [Note 12] See, e.g., Nolan v. Police Comm'r of Boston, 383 Mass. 625, 625-626 (1981). Accordingly, our consideration is limited to review of the board's conclusion that the city was

 Page 579 

 required to engage in impact bargaining over the means for implementation of the department's decision; that is, the criteria and procedures for the fitness for duty examinations. Like the board, we determine that the city is required to bargain.

 1. Standard of review. An appeal from a decision of the board is governed by G. L. c. 30A, § 14. See G. L. c. 150E, § 11 (i). Although we "accord deference to the [board's] specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions," Worcester v. Labor Relations Comm'n, 438 Mass. 177, 180 (2002), we will nevertheless set aside a decision if it is "[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." Somerville v. Commonwealth Employment Relations Bd., 470 Mass. 563, 568 (2015), quoting G. L. c. 30A, § 14 (7) (g). See Commonwealth v. Labor Relations Comm'n, 404 Mass. 124, 127 (1989), citing G. L. c. 30A, § 14 (7). "A commission's decision must be based on substantial evidence, i.e., such evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" North Attleboro v. Labor Relations Comm'n, 56 Mass. App. Ct. 635, 638 (2002), quoting G. L. c. 30A, § 1 (6).

 2. City's obligation to bargain. Public employers are required to "negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment," and are "prohibited" from "[r]efus[ing] to bargain collectively in good faith with the exclusive representative." G. L. c. 150E, §§ 6, 10 (a) (5). "A failure to meet and negotiate when there is a duty to do so and unilateral action without prior discussion can constitute an unlawful refusal to bargain . . . ." School Comm. of Newton v. Labor Relations Comm'n, 388 Mass. 557, 572 (1983). "[S]hort of impasse, [the public employer] may not unilaterally implement changes to a mandatory subject of bargaining without negotiation." Commonwealth, 404 Mass. at 127. Accordingly, a public employer violates G. L. c. 150E when it unilaterally changes an existing condition of employment or implements a new condition of employment concerning a mandatory subject of bargaining without first providing the union with notice and an opportunity to bargain to resolution or impasse. See School Comm. of Newton, supra; Lee v. Labor Relations Comm'n, 21 Mass. App. Ct. 166, 167 (1985).

 We discern no error in the board's determination that the impact and the means of implementing the city's requirement that

 Page 580 

 Doe undergo fitness for duty examinations were mandatory subjects of bargaining. Although "certain types of managerial decisions that must, as a matter of policy, be reserved to the public employer's discretion" are exempted from the duty to bargain, Worcester, 438 Mass. at 180, "the means of implementing such a nondelegable decision may properly be the subject of an enforceable collective bargaining agreement" (emphasis added). School Comm. of Newton, 388 Mass. at 564. The employer's obligation to bargain is particularly clear where the decision touches on the terms and conditions of employment. See Lynn v. Labor Relations Bd., 43 Mass. App. Ct. 172, 179-180 (1997) ("if the exclusive prerogative decision may be implemented in various ways, some touching on terms and conditions of employment, the public employer may be required to bargain about the impact of such decisions"). See, e.g., Worcester, supra at 185 (reduction in size of work force managerial prerogative but implementation affected terms and conditions and required negotiation); Burlington v. Labor Relations Comm'n, 390 Mass. 157, 165-166 (1983) (assignment of duties not subject to bargaining, but impact of decision, including loss of pay and opportunity, is); School Comm. of Newton, supra at 563 (termination of employment by layoff is "[c]ertainly . . . one of the 'terms and conditions of employment'" [citation omitted]); Framingham v. Framingham Police Officers Union, 93 Mass. App. Ct. 537, 544 (2018) (same).

 The question how the city determines that employees are fit for duty plainly impacted the terms and conditions of Doe's employment -- he was suspended from work, albeit with pay, until the examinations were completed and the results indicated that he had met the examinations' criteria and was "cleared" to work. See School Comm. of Newton, 388 Mass. at 564; Lynn, 43 Mass. App. Ct. at 176, 178 ("terms and conditions of employment" construed broadly). The fact that mere completion of the examinations did not result in Doe's reinstatement, and that he remained suspended until he had met whatever fitness criteria applied to the examinations, makes the point that the "methods and means" of the decision were critical to the terms of Doe's continued employment. We are satisfied that the board did not err in concluding that the examination results had a direct impact on job security and the city's managerial decisions with respect to employment, and that the methods by which the examinations were conducted were the mandatory subjects of bargaining. Cf. Chief Justice for Admin.

 Page 581 

 & Mgt. of the Trial Court v. Commonwealth Employment Relations Bd., 79 Mass. App. Ct. 374, 386-387 (2011) (no bargaining required where no impact of decision on union employees).

 The criteria the union sought to bargain were distinct from the city's order for the examinations themselves. As we have emphasized, supra, the union did not dispute that the fitness for duty examinations could or should take place, whether the results of the examinations could be shared with the city, or what disciplinary steps the city could take based on the results of the examinations; rather, the union demanded the ability to bargain over the process of requesting the examinations and the procedures for administering the examinations, as well as the subsequent use of information obtained in the course of the examinations. We agree with the board that there is a distinction between ordering an examination and the procedures for implementation, e.g., choosing an examiner, and the method and means by which the examination will be carried out. Cf. Local 346, Int'l Bhd. of Police Officers v. Labor Relations Comm'n, 391 Mass. 429, 441-442 (1984) (no distinction perceived between decision to require officer to undergo polygraph testing or face discharge and means or impact of decision).

 We are not persuaded that the city's policy arguments mandate a different result than that reached by the board. The city argues that it had a compelling interest in ensuring the safety and fitness for duty of officers, particularly where officers are engaged in activities that implicate public safety. See Nolan, 383 Mass. at 630. We do not disagree, but conclude that the city's interest in public safety is not undercut by the requirement that it engage in impact bargaining with the union over the procedures and criteria for the fitness for duty examinations. Cf. Local 346, Int'l Bhd. Of Police Officers, 391 Mass. at 437-438 ("the police department's overriding interest in the integrity of its police officers exempted the town from negotiating with the union over the use of polygraph examinations to investigate criminal activity by police officers"). [Note 13]

 Similarly, we disagree with the city that a negotiation requirement would "unduly impinge on [its] freedom to perform its public functions" -- such a requirement would have no effect on the city's prerogative to require that its superior officers be fit for duty, or on its ability to continue to order fitness for

 Page 582 

 duty examinations. Local 346, Int'l Bhd. Of Police Officers, 391 Mass. at 437. Engaging in impact bargaining over the fitness for duty examinations does not suggest that the examinations would be eliminated, nor does it hinder the effectiveness of the examinations or render the city unable to confidently rely on the results. Likewise, in arguing that by requiring it to bargain over the method, means, and impact of fitness for duty examinations in this instance the board opened the floodgates to protracted negotiations with every union on every case, the city overstates the practical difficulties of the duty to bargain over the impact of its decision-making, a duty which has been the law of the Commonwealth since the adoption of G. L. c. 150E in 1973. [Note 14] See St. 1973, c. 1078, § 2.

 We also are not persuaded by the city's argument that it was insulated from its duty to bargain the terms and impact of the fitness for duty examinations order by the interplay between the provisions of G. L. c. 150E and G. L. c. 31, § 61A (civil service law). Essentially, the city argues that because the civil service law allows "the administrator" to promulgate "health and physical fitness standards" applicable to all police officers, [Note 15] and because the civil service law is not part of the limited list of laws set forth in G. L. c. 150E, § 7 (d), as subordinated to conflicting provisions in collective bargaining agreements, the civil service law, and not the CBA, should control here. We do not agree.

 Page 583 

 General Laws c. 150E, § 7 (d), provides that where "a collective bargaining agreement . . . contains a conflict between matters which are within the scope of negotiations pursuant to section six [and] any municipal personnel ordinance, by-law, rule or regulation . . . the terms of the collective bargaining agreement shall prevail." Conversely, "[s]tatutes not specifically enumerated in [G. L. c. 150E,] § 7 (d)[,] will prevail over contrary terms in collective bargaining agreements." School Comm. of Natick v. Educational Ass'n of Natick, 423 Mass. 34, 39 (1996), quoting National Ass'n of Gov't Employees v. Commonwealth, 419 Mass. 448, 452, cert. denied, 515 U.S. 1161 (1995). See National Ass'n of Gov't Employees, Local R1-162 v. Labor Relations Comm'n, 17 Mass. App. Ct. 542, 544 (1984). In other words, "a collective bargaining agreement may not require a result that conflicts with a mandate of State law, unless the law is listed in § 7 (d)." Dedham v. Dedham Police Ass'n (Lieutenants & Sergeants), 46 Mass. App. Ct. 418, 419 (1999).

 Because, as the city points out, the civil service law is not among the statutory provisions listed in G. L. c. 150E, § 7 (d), in the event of a conflict between the CBA here and the civil service law, the civil service law's terms would prevail. Dedham, 46 Mass. App. Ct. at 420-421 (where "nothing in the civil service law or in any other law that has been called to [the court's] attention" relates to those "mandatory subjects of collective bargaining," "[t]he parties to the collective bargaining agreement were free to agree to any principle they wished . . . [because] nothing in the law or in the commission's order constrained their choice"); National Ass'n of Gov't Employees, Local R1-162, 17 Mass. App. Ct. at 545. See Burlington, 390 Mass. at 163 (no "direct conflict" between collective bargaining agreement and terms of statute). Here, however, the city has not only failed to demonstrate any conflict between the statute and the CBA, it has failed to demonstrate that "the administrator" has ever actually issued the standards referred to in G. L. c. 31, § 61A. See Rodrigues v. Public Employee Retirement Admin. Comm'n, 98 Mass. App. Ct. 514, 523 n.13 (2020) ("It is undisputed that [the Commonwealth's human resources division] has never actually promulgated a set of in-service [fitness] standards" under G. L. c. 31, § 61A). In the absence of such standards, there can be no 

 Page 584 

actual conflict between the CBA and the civil service law. [Note 16] Cf. Adams v. Boston, 461 Mass. 602, 608 (2012) ("To determine if a CBA provision is contrary to a statute not listed in § 7 [d], we ask whether the provision materially conflicts with the statute"). As general grants of legislative authority in statutes not listed in § 7 (d) do not automatically supersede the statutory bargaining obligation, see School Comm. of Newton, 388 Mass. at 566, the city's obligation to bargain was not suspended by operation of these statutes. Accordingly, the city is not relieved of its duty to bargain.

 3. Waiver. We decline to disturb the board's conclusion that the union did not waive its right to bargain.

 a. Waiver by contract. "In order to assert contractual waiver as an affirmative defense . . . an employer has the burden of proving that the contract clearly, unequivocally and specifically authorizes its actions." Boston v. Labor Relations Comm'n, 48 Mass. App. Ct. 169, 174 (1999), quoting Commonwealth of Massachusetts, 18 M.L.C. 1403, 1405 (1992). See School Comm. of Newton, 388 Mass. at 569 ("waiver must be shown clearly, unmistakably, and unequivoca[lly]"). "The evidence must be clear and unmistakable. Even a broad but general management rights clause does not constitute such a waiver." Boston, supra at 175, citing School Comm. of Newton, supra.

 The city argues that article VI ("Medical Examination") and article XV ("Management Rights") of the CBA constitute waiver. [Note 17]

 Page 585 

 Article VI recognizes the importance of "maintenance of good health and physical fitness" and permits the city to require "Superior Officers" [Note 18] to complete "an annual medical examination conducted by the City Physician's Office." Despite the article's obvious relation to the city's interest in advancing the physical health of its police force, nothing in either of these provisions suggests that the union had (and forwent) the opportunity to negotiate over the type of fitness for duty examinations at issue in Doe's case. We see a clear distinction between the agreement to an annual physical examination by a specified examiner and fitness for duty examinations, including a psychological examination, performed entirely at the discretion of the city. The CBA is silent on the latter.

 Article XV vests in the police department the authority to, inter alia, "establish or continue polices, practices and procedures for the conduct of the City business and, from time to time, to change or abolish such policies, practices or procedures." The city argues the board's decision renders this provision superfluous. We disagree. A broadly framed "managements rights clause" does not "provide a basis for inferring a clear and unmistakable waiver." School Comm. of Newton, 388 Mass. at 569, and cases cited.

 We agree with the board that as a matter of law neither article VI nor article XV of the CBA evidences the union's waiver of mandatory bargaining over the manner and means of fitness for duty examinations. [Note 19]

 b. Waiver by inaction. Waiver by inaction must be supported by evidence that the union had actual knowledge and a reasonable 

 Page 586 

opportunity to negotiate over the proposed change, but unreasonably or inexplicably failed to bargain or request to bargain. School Comm. of Newton, 388 Mass. at 570 ("A party may show that the other party clearly and unmistakably waived its right to bargain over an unlawful unilateral change where the other party had actual notice of the proposed change, a reasonable opportunity to negotiate over it, and unreasonably or inexplicably failed to bargain or to request bargaining"). See Commonwealth, 404 Mass. at 127; Commonwealth of Massachusetts, 28 M.L.C. 239, 242 (2002); Town of Milford, 15 M.L.C. 1247, 1252-1254 (1988).

 The city seemingly does not argue on appeal that it directly notified the union of Doe's or any past examination orders. We find support in the record for the board's rejection of the city's argument for waiver by inaction based on its conclusion that the city had no mutually known and agreed-upon past practice of sending officers for examination, or for unilaterally imposing the procedure related to the examinations, and thus, that the union did not have actual knowledge of the city's actions. Even if, as the city argues, it historically had sent other officers for fitness for duty examinations with parameters defined at the city's discretion before it imposed that requirement on Doe, the city offers no evidence that it provided the union with notice of any of those prior examinations. At issue is the method by which the examinations are conducted. To the extent that the city contends that it was foreclosed from notifying the union of other superior officers' examinations because to do so would have been a violation of the subject officers' privacy, its argument is not developed on appeal. See Atwater v. Commissioner of Educ., 460 Mass. 844, 853 n.8 (2011). The lack of notice is dispositive. Conditioning Doe's continued employment on examinations with parameters established solely by the city was not part of a known or agreed-upon practice with the union and was therefore "a unilateral change." Lynn, 43 Mass. App. Ct. at 177. See Massachusetts Port Auth., 36 M.L.C. 5, 11-12 (2009).

 We are not persuaded by the city's argument that either city ordinance § 2-46(c) [Note 20] or the code of conduct [Note 21] put the union on notice of the fact that the city was conducting fitness for duty examinations. As the board noted, even if the code of conduct or 

 Page 587 

city ordinance empowered the city to order fitness for duty examinations like the ones at issue in this case, the union could not have waived by inaction its right to bargain unless it had actual notice that the examinations were being performed in reliance on the code or ordinance. [Note 22] 

 We agree with the board's conclusion that the union did not waive its right to negotiate the means and impact of the fitness for duty examination requirement.

 4. Conclusion. For the reasons stated above, the decision and order of the board is affirmed.

 So ordered.

FOOTNOTES
[Note 1] Newton Police Superior Officers Association, MassCOP Local 401. 

[Note 2] A pseudonym. 

[Note 3] General Laws c. 150E, § 10 (a), provides, in relevant part, that "[i]t shall be a prohibited practice for a public employer or its designated representative to: (1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter; . . . (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section six." 

[Note 4] As we note, infra, the union does not dispute the board's determination that the decision to order a fitness for duty examination is within the city's managerial prerogative and is not subject to mandatory bargaining. 

[Note 5] The focus of the union's argument, and the decisions of the DLR and the board, was on the requirement that the city bargain the means of the fitness for duty determination. Because the results of any fitness for duty examination bore directly on the subject officer's employment status and on his expectation of privacy in the results of any such examination, the union's argument also implicated the consequences of those examinations. We are not called on, however, to determine what disciplinary steps the city could properly take based on the results of the examinations. 

[Note 6] The human resources employment manager testified that the chief told her that Doe had not "seemed like himself," had been "dozing off at work and [was] not as responsive or proactive as he had been in the past," and that "there was a definite change in his work performance and personality." 

[Note 7] The code of conduct provided: "Physical or Psychological Exam - An employee shall submit to a physical, mental or psychological examination, at the expense of the Newton Police Department, when so ordered for just cause as determined by the Chief of Police." 

[Note 8] City ordinance § 2-46(c) stated: 

"Upon determination by a department head, the director of human resources or the mayor that an employee while engaged in the performance of their duty, appears to be suffering from sickness or injury so as to constitute a hazard to their health or the health of other persons, the director of human resources may order such employee to discontinue their duties for such time as the director deems desirable and may require such employee to undergo an examination by a qualified health care provider(s) without charge to the employee."

[Note 9] For each appointment, the union requested to know the following: "[u]nder what authority" the chief ordered Doe to be examined; the "just cause" for the order or "any other authority" the chief relied on; "[w]hat tests or other diagnostics were requested by the Newton Police Department/City of Newton to be performed"; and "[w]hat information was communicated to [the examiners]." The union also requested copies of all communications between the city police department or the city and the examiners concerning Doe. 

[Note 10] The DLR dismissed the union's claims that the city repudiated article 32.04 of the CBA (count I) and failed to timely provide information (count II). Additionally, the DLR ordered the city to desist from its refusal to bargain with the union and from imposing a fitness for duty examination policy without notice to the union and an opportunity to bargain. The city was further ordered to bargain with the union on demand about criteria and procedure for imposing fitness for duty examinations, to rescind the unilateral imposition of a fitness for duty examination until the city had bargained with the union over the criteria and procedure for those examinations, to post the DLR's notice of its decision in a place conspicuous to members of the union's bargaining unit, and to notify the DLR of corrective action within ten days of receipt of the decision. 

[Note 11] The board issued additional orders that paralleled those in the DLR's decision. See note 10, supra. 

[Note 12] The union, on these facts, did not challenge the order placing Doe on paid administrative leave and accepted that the decision to place Doe on leave and to seek an examination regarding his fitness was within the city's managerial rights. Likewise, there is no challenge to the board's conclusion that "a public employer has a nonbargainable prerogative to decide that it will employ only physically and psychologically healthy persons." 

[Note 13] The city did not argue below, as it does on appeal, that bargaining with the union would be costly, and we decline to reach the argument. 

[Note 14] Indeed, the city and the union successfully negotiated an article of the CBA entitled "Drug and Alcohol Abuse Policy" that included, inter alia, standards for initiating testing, testing administration, and the consequences of testing outcomes. No argument was made that the negotiation of this policy resulted in catastrophic delays or occasioned other safety risks. 

[Note 15] General Laws c. 31, § 61A, fourth par., provides, in relevant part: 

"The administrator[] shall establish in-service health and physical fitness standards which shall be applicable to all police officers . . . in permanent, temporary, intermittent, and reserve positions in cities and towns. Such standards shall be established by regulations promulgated by the administrator after consultation with representatives of police . . . unions, and the Massachusetts Municipal Association. Notwithstanding the provisions of this paragraph, any municipality may adopt, subject to collective bargaining, stricter in-service health and physical fitness standards. Such in-service health and physical fitness standards shall be rationally related to the duties of such positions and shall have the purpose of minimizing health and safety risks to the public, fellow workers, and the police officers . . . themselves. Such standards shall take into account the age of the police officer . . . ."

[Note 16] We acknowledge the city's citation to cases from other jurisdictions and past arbitrations. To the extent that any of those decisions are not materially distinguishable from the instant case (and we do not imply that any of those cases is similar), we decline to follow as an example this nonbinding precedent. 

[Note 17] Article VI, "Medical Examinations," provides in relevant part: 

"b. The City and the Association agree that the maintenance of good health and physical fitness is important to the successful performance of all of the duties of a Superior Officer.

"c. Superior Officers may be required to complete an annual medical examination conducted by the City Physician's Office. . . [I]f the City Physician continues to require that additional testing be carried out, then the Superior Officer will cooperate in any recommended program to manage responsibly his/her medical condition . . . ." 

Article XV, "Management Rights," provides in relevant part:

"[The city] shall have the sole and unquestioned right, responsibility and prerogative of management of the affairs of the City and direction of the working forces including . . . 

". . .

"B. To establish or continue policies, practices and procedures for the conduct of the City business and, from time to time, to change or abolish such policies, practices or procedures.

". . .

"F. To prescribe and enforce reasonable rules and regulations for the maintenance of discipline and for the performance of work in accordance with the requirement of the City, provided such rules and regulations are made known in a reasonable manner to the Superior Officers affected by them."

[Note 18] This classification would have included Doe. 

[Note 19] We note, as the union aptly points out, that the city did not invoke these provisions when ordering Doe to undergo the examinations. Furthermore, the board has consistently determined that the means of determining an employee's fitness for duty is, indeed, a mandatory bargaining subject. See City of Haverhill, 16 M.L.C. 1077, 1081 (1989). Cf. Boston Sch. Comm., 3 M.L.C. 1603, 1607 (1977). 

[Note 20] See note 8, supra. 

[Note 21] See note 7, supra. 

[Note 22] We are not persuaded that the board erred in rejecting the city's argument that privacy concerns precluded the city from communicating with the union about past fitness for duty examinations. See Usen v. Usen, 359 Mass. 453, 457 (1971). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.